UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TYRONE BOSTICK,

    Plaintiff,

v.            Case No. 6:15-cv-1533-Orl-37GJK

DEPUTY LATASHA MCGUIRE;
DEPUTY JOHN DOE 1; and
DEPUTY JOHN DOE 2,

    Defendants.
_____

### ORDER

This matter is before the Court on the following:

(1) Defendant Deputy Latasha McGuire's Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof (Doc. 38), filed November 3, 2016;

(2) Plaintiff's Response to Defendant Latasha McGuire's Motion for Partial Summary Judgment (Doc. 45), filed November 16, 2016;

(3) Defendant Deputy Latasha McGuire's, Reply to Plaintiff's Response to Defendant's Motion for Partial Summary Judgment (Doc. 46), filed November 30, 2016.

# I.   INTRODUCTION[1]

This action arose late in the evening on **August 22, 2011**, when three on-duty deputy sheriffs ("**Deputies**") employed by the Orange County Sheriff's Office ("**OCSO**")—Latasha McGuire ("**McGuire**"), Brian Hummell ("**Hummell**"), and Ryan Donovan ("**Donovan**") — spotted Plaintiff Tyrone Bostick ("**Plaintiff**") walking alone near a closed business in Orlando, Florida. (*See* Doc. 39-1, ¶¶ 4, 8.) Without triggering lights or sirens in the unmarked Dodge Intrepid ("**Vehicle**") she was driving, McGuire pulled behind Plaintiff in order to initiate a "consensual" encounter. (*See id*. ¶¶ 8, 9; Doc. 45-3, pp. 1–2.) Before the Deputies had completely exited the Vehicle, Plaintiff—who had at that point done nothing that might support a reasonable articulable suspicion of criminal activity—fled in fear. (*See* Doc. 43-1, pp. 122–23, 127–29, 134–35.) The Deputies gave chase, and the chase ended when Plaintiff was knocked to the ground, handcuffed, beat, searched, and taken into custody with injuries to his hands, knees, and head. (*See id*. 78–79, 81, 131–32, 138–40, 144–50; *see also* Doc. 41-1, p. 15; Doc. 45-3, p. 2; Doc. 45-4, ¶ 9.)

Four years after this incident, on **August 21, 2015**, Plaintiff filed a complaint in state court against McGuire, Sheriff Jerry L. Demings ("**Demings**"), and two unnamed Defendants ("**Doe Defendants**"). (Doc. 2.) Less than thirty days later, Demings and McGuire removed the action to this Court (Doc. 1) and filed motions to dismiss the claims

---

1The facts recited here and in more detail below are not the actual facts of the case. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Rather, they reflect the Plaintiff's "best case"—which is what the Court must consider at this stage of the proceedings. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *see also Walker v. City of Riviera Beach*, 212 F. App'x 835, 837 (11th Cir. 2006).

against them (Docs. 6, 7). Plaintiff then filed an Amended Complaint, which contained state law and federal civil rights claims against McGuire and the Doe Defendants but did not name Demings as a Defendant. (Doc. 13.) McGuire again moved to dismiss (Doc. 16 ("**MTD**")), and Plaintiff requested leave to file a second amended complaint to name Hummell and Donovan in place of the Doe Defendants (Doc. 28 ("**MTA**")). The Court granted the MTD in part and dismissed Count Twenty-One (Doc. 30), and it denied the MTA as futile because the statute of limitations had passed on Plaintiff's claims against Hummell and Donovan (Docs. 32, 33).

McGuire now moves for summary judgment on the six claims asserted against her: (1) invasion of privacy, intentional infliction of emotional distress ("**IIED**"), and false imprisonment under state law; and (2) unlawful search, seizure, and use of excessive force in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution. (Doc. 38 ("**SJ Motion**").) Plaintiff responded in opposition to the SJ Motion (Doc. 45 ("**Response**")), McGuire replied (Doc. 46 ("**Reply**")), and the matter is now ripe for adjudication.

## II.   LEGAL STANDARDS

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *e.g. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Penley v. Eslinger*, 605 F.3d 843, 848–49 (11th Cir. 2010). In resolving motions for summary judgment, courts must not make credibility assessments or weigh conflicting evidence. *See Hairston v.*

*Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Rather, courts must: (1) view the record evidence in the light most favorable to the non-moving party; and (2) draw all reasonable inferences in favor of the non-moving party. *See White v. Pauly*, 137 S. Ct. 548, 550 (2017); *see also supra* n.1. If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment.[2] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### III.   THE FACTS VIEWED IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

On **August 22, 2011**, Plaintiff was visiting his parents in a West Orange County neighborhood where he had lived for most of his life. (*See* Doc. 43-1, pp. 6, 11, 127–28.) Plaintiff claimed it was not a "high crime" area. (*See id.*) Plaintiff did not have a car, so a friend had dropped Plaintiff off at his mother's home around 10:30 p.m. (*See id.* at 11–12, 14.) After visiting his mother and sister for approximately two hours, Plaintiff set off to walk by himself to his father's home, which was about a mile and a half away. (*See id.* at 15–17, 20.) Plaintiff—a 5'8" and 165 pound black male—was wearing "blue jeans, a black shirt with gray and silver writing," and black athletic shoes. (*See id.* at 21.) He was not carrying a bag of any kind. (*See id.*)

While Plaintiff was walking through his family's neighborhood—which the Deputies contend is a high crime area—the Deputies were conducting "proactive" patrol while dressed in their "official OCSO issued uniform[s] consisting of: an OCSO badge,

---

2 An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260.

gold embroidered law enforcement shield on each shoulder sleeve," a ballistic vest, and a "utility belt that contained OCSO issued gun, gun holder, ammunition, baton, flashlight, handcuffs, Taser and OC spray."[3] (*See* Doc. 39-1, ¶¶ 4, 6, 7; Doc. 39-2, ¶¶ 4, 6, 7; Doc. 41-1, p. 6; Doc. 42-1, p. 12; *see also* Doc. 40-1, p. 9 (testifying that the Deputies were conducting "directed patrol in some of the higher crime areas of Sector 3," Pine Hills).) Although it was not her usual practice, McGuire was driving Donovan and Hummell in an unmarked "pool car"—the Vehicle—which was checked out from the substation. (*See* Doc. 41-1, pp. 6–7; *see also* Doc. 39-1, ¶ 5; Doc. 39-2, ¶ 5; Doc. 40-1, pp. 11–12.)

While Plaintiff was walking near a store that was out of business in a poorly-lit area on Ivey Lane, he noticed the Vehicle drive past him, make a U-turn, and drive back toward him, at which point Plaintiff also noticed that the windshield of the Vehicle was tinted and he could not see in. (*See* Doc. 43-1, pp. 121–22, 126.) The Vehicle then made another quick turn to pull close behind Plaintiff.[4] (*See id*. at 122–27.) Before the Vehicle even came to a stop, Plaintiff saw the backdoors open and black gloved hands begin to emerge on both sides. (*See id*.)

Because Plaintiff was alone, it was late at night, he could not see into the windshield of the Vehicle, and no police lights had flashed, Plaintiff became frightened.

---

3 Plaintiff denies that he recognized that the Deputies were law enforcement until he was taken to jail; rather, he thought that the Deputies were dressed all in black—not in police uniforms. (*See* Doc. 43-1, pp. 105–06, 168.)

4 The Deputies agree that McGuire pulled the Vehicle very close behind Plaintiff, and they explain that McGuire did so in an attempt to engage Plaintiff in a consensual encounter. (*See* Doc. 39-1, ¶ 9; Doc. 39-2, ¶ 9; Doc. 40-1, pp. 13–14; Doc. 41-1, p. 9; Doc. 42-1, p. 6; Doc. 45-3, p. 1; Doc. 45-4, ¶ 5.)

(*See* Doc. 43-1, pp. 123, 127–29.) Thinking "the worst", he immediately "started to run" toward a lighted area before the Deputies fully emerged from the Vehicle.[5] (*See id.*)

According to Plaintiff:

> I decided to go straight across [the street] which is corner to corner. And this right here, was the only place where they had lights. But, before I can even get across the corner, both of the police officers, at the time, was up on me to a point where when I finally got to the—to the edge of the corner, I felt hands on me.

(*See id.* at 130.) Plaintiff further testified that, while in full stride, he was pushed from behind and fell onto the sidewalk[6]:

> When I got pushed, I rolled a little bit. I slid first and then rolled a little bit. While I'm down—face down, I feel one of them with one arm and the other one with the other arm, pulling me up by the back end of my shirt and with the free arm, they was [sic] beating me. So by the time I get down to the ditch, I looked back and realized that I'm three to four houses down from the corner.

(Doc. 43-1, p. 139; *see also id.* at 81–82, 131–32, 134.) Plaintiff denies that he heard anyone direct him to stop or shout police, but he claims that he did hear two male voices from the Vehicle yell racial epithets and threats to his life just as he started to flee. (*See id.* at

---

[5] The Deputies contend that McGuire brought the Vehicle to a complete stop and they had exited the Vehicle and were just standing by the Vehicle when Plaintiff looked at them and *then* took flight. (*See* Doc. 39-1, ¶ 10 ("After exiting the [Vehicle, Plaintiff] looked in our direction and then ran toward us . . . . Once he ran past us, I started running after him in a foot pursuit."); *see also* Doc. 40-1, pp. 14–15; Doc. 42-1, p. 7.)

[6] All three Deputies testified that immediately upon crossing the street, Plaintiff fell on his own in a drainage ditch. (*See* Doc. 39-1, ¶ 10; Doc. 39-2, ¶ 10; Doc. 40-1, p. 17 ("Once he got to the other side he tripped and fell in a . . . drainage ditch."); Doc. 41-1, pp. 11–12; Doc. 42-1, p. 9; Doc. 45-1, p. 2; Doc. 45-3, pp. 1–2 ("While running through the ditch on the west side of Ivey Lane at Lenox Blvd, [Plaintiff] tripped and fell towards the concrete sidewalk.")

123–24, 128, 134–36.)

McGuire testified that while Plaintiff was running across the street, she verbally identified the Deputies as police and ordered Plaintiff to stop running when she saw him commit a pedestrian violation. (*See* Doc. 41-1, pp. 10–11.) No one else remembers McGuire yelling such statements (*see* Doc. 40-1, p. 16; Doc. 42-1, pp. 8–9), and both Hummell and Donovan testified that they did not identify themselves as police or order Plaintiff to stop. (*See* Doc. 40-1, p. 16; Doc. 42-1, pp. 8–9.) McGuire also testified that all three Deputies chased after Plaintiff, and—while Donovan and Hummell restrained him—she is the one who placed handcuffs on Plaintiff and searched him. (*See* Doc. 41-1, pp. 11, 12, 15.) Donovan and Hummell similarly testified that McGuire was present and involved in the restraint and handcuffing of Plaintiff. (*See* Doc. 40-1, p. 18; Doc. 42-1, p. 9.)

Unlike the Deputies, Plaintiff did not know where McGuire was when he was restrained and handcuffed because she did not "make herself known at all." (*See* Doc. 43-1, pp. 137, 166–67.) According to Plaintiff, his head was down and he did not "have a chance to look around" while the male Deputies beat him with closed fists and a black baton on the head and body both before and after McGuire put him in handcuffs. (*See* Doc. 43-1, pp. 108–10, 118–19, 138-39, 142–49, 169.) Plaintiff testified that he did not defend himself by striking back at the Deputies (*see id*. at 168–69), but he was "crying" and screamed for help (*see id*. at 141, 148). Plaintiff further testified that the beating did not stop until "two other officers showed up" in a marked car with lights and sirens. (*See id*. at 108–09, 118–19, 150–51.)

At McGuire's request, the fire department responded to examine injuries on Plaintiff's hands,[7] but Plaintiff refused treatment and transport to the hospital. (*See* Doc. 45-3, p. 2; *see also* Doc. 43-1, p. 84.) Plaintiff instead was transported to jail where McGuire wrote an Incident Report ("**Report**") which included a description of Plaintiff's arrest that made no mention of Donovan or Hummell:

> Upon stopping my unmarked car, I exited the vehicle. . . . As I went around the rear of my vehicle, [Plaintiff] could see that I was law enforcement. . . .
>
> [Plaintiff] suddenly ran, taking headlong flight . . . past my car, running away from me. Upon reaching Ivey Ln, [Plaintiff] crossed the street diagonally . . . thereby committing a pedestrian violation. I yelled for [Plaintiff] to stop running and talk to me at this time . . . . [Plaintiff] did not comply, continuing to run eastbound away from me . . . .
>
> [Plaintiff] then ran into the grass, approximately 20 feet from Ivey Lane, where there is a drainage ditch. [Plaintiff] fell forward after tripping on the drainage ditch, causing lacerations to his hands. I was able to reach [Plaintiff] and secure him after he fell. . . .
>
> I subsequently arrested [Plaintiff] for resisting an officer without violence.

(Doc. 45-1, p. 2; *see also* Doc. 41-1, pp. 13–15.)

McGuire explained that she arrested Plaintiff for the misdemeanor offense of resisting an officer without violence in violation of Florida Statutes, § 843.02 ("**ROWV**")

---

[7] (*See* Doc. 40-1, p. 18 ("Once he was secured, we saw that he had some lacerations and contusions on his hand so we called for the fire department"); Doc. 41-1, p. 11 (testifying that the Deputies "called for the fire department" because Plaintiff "had abrasions on his hands"); Doc. 42-1, p. 8 (testifying that the fire department arrived and "evaluated" Plaintiff's injuries"); Doc. 45-3, p. 2.)

"[b]ecause he failed to stop when I told him to do so after identifying ourselves as law enforcement." (*See* Doc. 41-1, p. 12; *see also* Doc. 45-1; Doc. 45-3, p. 2.) She said she did not mention Donovan or Hummell in the Report because "it was a small, insignificant misdemeanor crime . . . and [t]hey didn't do anything that warranted documentation for which I wasn't present for, and I'm the one who made the arrest." (*See* Doc. 41-1, p. 13; *see also* Doc. 42-1, p. 11 (explaining that "McGuire was the one . . . that engaged in the consensual encounter" and "witnessed" the pedestrian violation, "so she was the arresting officer"); Doc 43-1, pp. 102, 115–16 (describing McGuire as the "lead officer").)

Plaintiff testified that he spent one day in jail after his arrest. (*See id*. at 11.) Plaintiff had to borrow $500 from a friend to post bail, he had to appear in court one time, and he had to meet his appointed public defender in the public defender's office. (*See id*. at 23–27.) Ultimately, the State Attorney terminated the criminal action against Plaintiff by entering a *nolle prosequi*. (*See* Doc. 45-2; *see also* Doc. 43-1, p. 26.) Since these events, Plaintiff claims that he has had trouble finding work, attending school, and going about his business without anxiety and fear. (*See e.g.* Doc. 41-1, pp. 27–31, 83, 96.)

## IV.   PLAINTIFF'S STATE LAW CLAIMS

Plaintiff asserts three state law claims against McGuire for invasion of privacy/intrusion on seclusion ("**Count One**"), intentional infliction of emotional distress ("**Count Eleven**"), and false imprisonment ("**Count Six**"). (*See* Doc. 13, ¶¶ 34–38, 61–71, 112–20.) In her SJ Motion, McGuire argues that: (1) Count One fails because Plaintiff had no reasonable expectation of privacy while he walked on a public street (*see* Doc. 38, pp. 7–8); (2) Count Eleven is wholly unsubstantiated (*see id*. at 12–13); and

(3) Count Six fails because McGuire had probable cause to arrest Plaintiff (*see id.* at 8–11). As explained below, the Court agrees with McGuire concerning Counts One and Eleven but rejects her arguments concerning Count Six.

### A.     Count One

Florida law is clear that the tort of intrusion upon seclusion protects persons located in a "place" where the person has a reasonable expectation of privacy. *See Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724, 726 (11th Cir. 2011); *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 160–62 (Fla. 2003). A public street is not such a "place." *See Spilfogel*, 433 F. App'x at 726 (affirming dismissal because the complained of intrusion occurred on a public street). Here, the events complained of by Plaintiff indisputably occurred on a public street; thus, Count One fails as a matter of law, and summary judgment is due to be entered in favor of McGuire.[8]

### B.     Count Eleven

Under Florida law, recovery for the tort of intentional infliction of emotional distress ("**IIED**") requires proof of the following elements: "(1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous, beyond all bounds of decency, and odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the distress was severe." *See Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015). McGuire argues that the Court should enter summary judgment in her favor because insufficient record evidence exists to raise a

---

[8] In any event, Plaintiff effectively abandoned Count One by failing to even reference it in his Response to the SJ Motion. (*See* Doc. 45.)

question of material fact concerning the severe distress element. (*See* Doc. 38, pp. 12–13.)

To satisfy the severe distress element, Plaintiff must point to evidence that the distress inflicted on him was "so severe that no reasonable man could be expected to endure it." *See Frias v. Demings*, 823 F. Supp. 2d 1279, 1288–89 (M.D. Fla. 2011) (quoting Restatement (Second) of Torts § 46, cmt. j (1965)). The only evidence identified by Plaintiff—his own testimony that he's "paranoid when [he's] around police and stuff [and he] don't [sic] go outside much"—does not meet this high standard. (*See* Doc. 45, p. 7 (citing Doc. 43-1, p. 83); *see also* Doc. 43-1, pp. 73–74 (testifying that Plaintiff had not received mental health counseling).) Thus, summary judgment is due to be entered in favor of McGuire on Count Eleven.[9]

## C.      Count Six

Under Florida law, false imprisonment is the unlawful, unwarranted, and unreasonable "restraint of a person against his will." *See Kanner v. First Nat'l Bank of S. Miami*, 287 So. 2d 715, 717 (Fla. 3d DCA 1974); *see also Harris v. Solvonic*, 386 So. 2d 19, 20 (Fla. 3d DCA 1980) (noting that law enforcement officers may be held liable for the tort of false arrest when they arrest a person without authority to do so). Proof that an arrest was supported by probable cause "is a complete bar to an action for false arrest and false

---

9 *See Pederson*, 806 F.3d at 1053–54 (affirming summary judgment in favor of defendant on IIED claim where plaintiff failed to point to evidence that he suffered "severe" emotional distress as a result of arrest); *Frias*, 823 F. Supp. 2d at 1289 (granting summary judgment because the embarrassment of a false arrest is insufficiently severe emotional distress to sustain an IIED claim); *see also Rubio v. Lopez*, 445 F. App'x 170, 175 (11th Cir. 2011) (finding testimony of psychiatrist concerning possible posttraumatic stress disorder was insufficient to defeat motion for summary judgment on IIED claim).

imprisonment." *See Bolanos v. Metro. Dade Cnty.*, 677 So. 2d 1005, 1005 (Fla. 3d DCA 1996).

"The key time to be considered with respect to an arrest is the moment of arrest at the scene, as to whether there was then and there . . . reasonable cause for arrest." *Spicy v. City of Miami*, 280 So. 2d 419, 422 (Fla. 1973).

McGuire contends that she is entitled to summary judgment on Count Six because she "lawfully arrested" Plaintiff for violating Florida Statute, § 843.02.[10] (*See* Doc. 38, pp. 9–11.) According to McGuire, the lawfulness of Plaintiff's arrest is established by the following facts: (1) McGuire observed Plaintiff "at night in a known high-crime area"; (2) Plaintiff "fled from uniformed deputies when approached" even though he "was aware" that they were pursuing him; and (3) "Plaintiff ignored [McGuire's] commands to stop running." (*See* Doc. 38, pp. 8, 11 (arguing that Plaintiff's flight gave the Deputies "legal cause to order Plaintiff to stop and his continued headlong flight in disregard of their order justified his arrest" for RWOV).)

The Court rejects McGuire's argument because it relies on disputed facts viewed in the light most favorable to McGuire—not Plaintiff. Indeed, under Plaintiff's best case, reasonable jurors could find that: (1) Plaintiff did not flee from the Deputies—he fled in fear from unseen persons emerging from a Dodge Intrepid with darkly tinted windows that inexplicably pulled up close behind him while he was innocently walking to his father's house; and (2) the Deputies neither identified themselves nor ordered Plaintiff to

---

10 Section 843.02 provides in pertinent part that those who "resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty . . . shall be guilty of a misdemeanor of the first degree."

stop before chasing him down, pushing him to the ground, and placing him in handcuffs. (*See* Doc. 43-1, pp. 122–24; *see also* Doc. 40-1, pp. 15–16; Doc. 42-1, pp. 8–9.) Because no reasonable officer could find that McGuire had probable cause to arrest Plaintiff under these facts—which reflect Plaintiff's "best case"— McGuire's request for summary judgment in her favor on Count Six is due to be denied.

## V.    PLAINTIFF'S FEDERAL CLAIMS

Plaintiff asserts three claims against McGuire in accordance with 42 U.S.C. §§ 1983 and 1988 for unlawful arrest ("**Count Fifteen**"), unlawful search ("**Count Twelve**"), and use of excessive force ("**Count Twenty**"), in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution. (*See* Doc. 13, ¶¶ 121–28, 145–55, 196–207.) McGuire argues that summary judgment should be entered in her favor on each of these claims because the record evidence establishes as a matter of law that: (1) McGuire did not violate any constitutional right of Plaintiff; and (2) the doctrine of qualified immunity ("**QI Doctrine**") shields McGuire from suit. (*See* Doc. 38, pp. 14–23.) Again, the Court rejects McGuire's arguments because they rely on facts that are contrary to the record evidence of Plaintiff's "best case."

### A.    The Legal Standards

#### 1.    The Fourth Amendment

Enforceable against the States through the Fourteenth Amendment, the Fourth Amendment protects the "right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. amend. IV; *see also Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (noting the Fourth Amendment

requirement that all searches and seizures are "objectively reasonable based on the totality of the circumstances"). Consensual encounters between police officers and persons are not prohibited under the Fourth Amendment; however, the Fourth Amendment does prohibit law enforcement officers from subjecting any person to: (1) an investigatory stop absent "reasonable suspicion" to suspect the particular person stopped of criminal activity (*see Navarette v. Cal.*, 134 S. Ct. 1683, 1687 (2014); *Terry v. Ohio*, 392 U.S. 1, 1 (1968)); and (2) a full custodial arrest unless such arrest is justified by a warrant or "probable cause" to believe the arrested person committed or was about to commit a criminal act (*see Dunaway v. N.Y.*, 442 U.S. 200, 208–09 (1979)).[11]

Absent a warrant or probable cause to arrest, the Fourth Amendment also prohibits law enforcement officers from searching and using physical force against a person. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).[12] Further, even if a seizure is justified by a warrant or probable cause, it still may be objectively unreasonable under the Fourth Amendment if an individual is subjected to "excessive force." *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989); *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).

---

11 Although "precise definitions" are impossible, the U.S. Supreme Court has explained that the probable cause standard requires "reasonable ground[s]" for a belief in the guilt of the particular person to be seized. *See Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003). Under the totality of the circumstances test, probable exists if—viewed from the standpoint of an objectively reasonable police officer—the facts and circumstances within the acting officer's knowledge "and of which [she] had reasonably trustworthy information" warrant the belief that the person to be seized committed or was committing a criminal offense. *See Brinegar v. United States*, 338 U.S. 160, 175–76 (1949).

12 Here, McGuire contends that she "had the authority to search Plaintiff's person incident to arrest." (Doc. 38, p. 16 (citing *Weeks v. United States*, 232 U.S. 838 (1914) and *Chimel v. Cal.*, 395 U.S. 752, 762–63 (1969)).

Arrests and investigatory stops necessarily involve "some degree of physical coercion;" thus, to determine that a particular use of force is objectively unreasonable, courts must "carefully balance" the "governmental interests at stake" against "'the nature and quality of the intrusion on the individual's Fourth Amendment interests.'" *See Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Again, courts must apply an objective totality of the circumstances test when assessing uses of force. *See id.* at 396–97.

### 2. 42 U.S.C. § 1983

Individuals may seek redress for violations of their Fourth Amendment rights by asserting claims under 42 U.S.C. § 1983. *See Baker v. McCollan*, 443 U.S. 137, 144 n.4 (1979) (describing § 1983 as a "method for vindicating federal rights elsewhere conferred"). To prevail on such a claim against a police officer sued in her individual capacity, a plaintiff must establish that the officer deprived him of his Fourth Amendment rights while acting under "color of state law." *See* 42 U.S.C. § 1983.

### 3. The QI Doctrine

The QI Doctrine shields public officials from liability under § 1983 so long as: (1) the official was acting within the course and scope of her employment ("**Threshold Issue**"); and (2) the official did not violate a "clearly established" constitutional right of which a "reasonable person would have known" ("**Constitutional Issue**"). *See Pauly*, 137 S. Ct. at 551. Properly applied, the QI Doctrine protects from suit all but "the plainly incompetent" or those who knowingly violate federal law. *See id.; see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

-15-

In unlawful search and seizure actions, only *arguable* probable cause need exist for the QI Doctrine to apply. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1113 (11th Cir. 2015) (noting that officers may be entitled to qualified immunity "even if there was no actual probable cause"). The "arguable" probable cause standard is satisfied if "an objectively reasonable officer in the same circumstances and possessing the same knowledge" as the arresting officer *could* believe that probable cause or reasonable suspicion justified the seizure of a person. *See Williams v. Sirmons*, 307 F. App'x 354, 358 (11th Cir. 2009). No "neat set of legal rules" applies to these inquiries. *See United States v. Sokolow*, 490 U.S. 1, 8 (1989). Rather, courts must apply "common-sense" and objectively assess the "totality of the circumstances" known to the officers at the time of the arrest and must not consider their subjective state of mind. *See id*.

## B.     The Threshold Issue

McGuire contends that the Threshold Issue is met because there is no "dispute" that she "was acting within the course and scope of her duties as a deputy sheriff" when she encountered Plaintiff on August 22, 2011. (*See* Doc. 38, p. 20.) Plaintiff counters that the Threshold Issue is in dispute because McGuire's "discretionary" duties would not allow her to: (1) "approach an innocent bystander in an unmarked vehicle from behind" after driving past him; (2) exit such vehicle and chase the innocent bystander without identifying herself; and (3) allow fellow officers to "viciously beat" the bystander. (*See* Doc. 45, p. 8.)

Plaintiff's argument reflects an "untenable tautology," that has been rejected by the U.S. Court of Appeals for the Eleventh Circuit. *See Holloman v. Harland*, 370 F.3d 1252,

1265–66 (11th Cir. 2004) (noting that the threshold qualified immunity issue cannot turn on allegations of misconduct because violation of "someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power"). To avoid this tautology, courts must "temporarily" put aside the fact that the conduct at issue may have been unconstitutional and focus instead on whether the "acts in question are of a type that fell within [the employee's] job responsibilities." *See id.* Thus, McGuire need not disprove Plaintiff's claims of unconstitutional conduct—she need only establish that she was performing legitimate job-related functions through means that were within her power to utilize. *See id.*

The facts are that McGuire has been employed by the OCSO as a deputy since 2008 (*see* Doc. 40-1, pp. 5–8), and on the evening of August 22, 2011: (1) she was working in the uniform patrol department; (2) she was on patrol in "Sector 3 in Pine Hills" with two other OCSO deputies (*see id.* at 8–11); and (3) as a deputy on patrol, McGuire had authority to "attempt to effectuate arrests." *See Holloman*, 370 F.3d at 1266–67; (*see also* Doc. 41-1, p. 6). Thus, but for "the alleged constitutional infirmity"—which the Court must disregard temporarily—it is clear that McGuire "was acting within the course and scope of her duties as a deputy sheriff" when she encountered Plaintiff. *See Holloman*, 370 F.3d at 1267; *Ferraro*, 284 F.3d at 1194 (finding that an allegedly unlawful arrest by a law enforcement officer fell within the "course and scope" of the officer's employment).

### C.    The Constitutional Issue

Because McGuire has established the Threshold Issue in her favor, Plaintiff can defeat the SJ Motion only by establishing that McGuire's actions violated Plaintiff's

constitutional rights,[13] and that such rights were clearly established. *See Hope v. Pelzer,* 536 U.S. 730, 741 (2002). A constitutional right is "clearly established" if precedent places the "constitutional question beyond debate." *See Mullenix,* 136 S. Ct. at 308. Here, pertinent precedent must pre-date **August 22, 2011**, and it must come from the U.S. Supreme Court, the Eleventh Circuit, or the Florida Supreme Court. *See id.* at 309; *see also Long v. Slaton,* 508 F.3d 576, 584 (11th Cir. 2007). In an "obvious case," general statements of constitutional law may provide officers with "fair and clear warning." *See Pauly,* 137 S. Ct. at 552 (citing *United States v. Lanier,* 520 U.S. 259, 271 (1997).) But in most cases, the pertinent precedent must be "particularized" to the facts of the case. *See id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)); *see also Brosseau v. Haugen,* 543 U.S. 194, 599–600 (2004) (emphasizing that the qualified immunity inquiry must relate to specific facts—not general propositions).

### 1. Counts Twelve & Fifteen

Here, McGuire admits that she "did not possess any information or knowledge to support a reasonable articulable suspicion that Plaintiff [] was engaged in, or had recently committed criminal activity" when she initiated the encounter with Plaintiff. (Doc. 45-4, ¶ 8.) Further, McGuire does not dispute that arguable probable cause existed to arrest Plaintiff for ROWV only if Plaintiff took unprovoked flight in a high crime area and then

---

13 Here, the constitutional rights at issue are the Fourth Amendment rights to be free from unreasonable arrests (Count Fifteen) and searches (Count Twelve) and use of excessive force (Count Twenty). (*See* Doc. 13; *see also* Doc. 45, p. 8.) Such rights are enforceable under the Fourth Amendment—not the more general Due Process Clause as Plaintiff asserts (*see* Doc. 45, p. 8). *See Albright v. Oliver,* 510 U.S. 266, 273–74 (1994).

failed to obey a lawful command to stop running. (*See* Doc. 38, pp. 18–19; Doc. 46, pp. 5, 6, 8 (discussing *C.E.L. v. State*, 24 So. 3d 1181 (Fla. 2009).) According to McGuire, the evidence establishes that she "engaged in a consensual encounter with Plaintiff, after which [he] took headlong flight" and continued to run after McGuire "ordered him to stop fleeing." (*See* Doc. 46, p. 7.)

Contrary to McGuire's characterization of the undisputed facts, the record evidence of Plaintiff's best case is that: (1) Plaintiff's flight was not "unprovoked" because the appearance and behavior of the Vehicle justified Plaintiff's fear and flight, which commenced *before* the Deputies fully emerged from the Vehicle;[14] (2) Plaintiff's flight was further justified by the threats and racial epithets he heard coming from the Vehicle; (3) the Deputies did not identify themselves to Plaintiff or order him to stop after initiating an encounter with him; and (4) with the assistance of Hummell and Donovan, McGuire simply chased an innocent person down, handcuffed him, arrested him for ROWV, and searched him without arguable cause of any kind. (*See* Doc. 45, pp. 9–15 (discussing *Skop v. City of Atlanta*, 485 F.3d 1130 (11th Cir. 2007) and *Jackson v. Sauls*, 206 F.3d 1156 (11th Cir. 2000)); *see also supra* Part. III.) Under these facts, McGuire is not entitled to qualified immunity for Counts Twelve or Fifteen, and McGuire's request for summary judgment in her favor on such claims is due to be denied.

---

14 Based on this fact, it is immaterial whether or not the Deputies were wearing their uniforms because no reasonable officer could have believed that Plaintiff actually saw the uniforms before he took flight.

### 2.      Count Twenty

As to Plaintiff's claims that he was subjected to excessive force in violation of the Fourth Amendment, McGuire concedes that "Plaintiff's account of the extensive beating creates a material issue of fact for the jury to determine." (Doc. 38, p. 22.) Thus, she does not request summary judgment to the extent Count Twenty is based on such beating. (*See id.*) Rather, McGuire requests partial summary judgment only to the extent that Plaintiff seeks to hold McGuire vicariously liable for the push that initially caused Plaintiff to fall to the ground. (*See id.*) As to this claim, McGuire argues that she is entitled to summary judgment because the record is "undisputed" that McGuire was not in a position to intervene in the push because it "occurred too rapidly." (*See* Doc. 38, pp. 21–23 (citing *Brown v. City of Huntsville*, 608 F.3d 724, 740, n.40 (11th Cir. 2010) and *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996)); *see also* Doc. 46, p. 10 (citing *Ensley v. Sloper*, 142 F.3d 1402, 1407–08).)

In his Response, Plaintiff relied on a clearly distinguishable case decided by the Eleventh Circuit — *Priester v. City of Riviera Beach*, 208 F.3d 919, 927–928 (11th Cir. 2000) — which involved an officer's failure to intervene when his K-9 officer attacked an arrestee. (*See* Doc. 45, pp. 15–16.) Plaintiff also failed to specify how McGuire could possibly have prevented Hummell or Donovan from pushing Plaintiff to the ground so quickly after the chase commenced. (*See id.*) Accordingly, the Court finds that McGuire is entitled to *partial* summary judgment on Count Twenty. At trial, Count Twenty will be limited to the question of whether McGuire may be held liable — on a failure to intervene theory — for the force Plaintiff was subjected to by Hummell and Donovan *after* Plaintiff fell.

IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.      Defendant Deputy Latasha McGuire's Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof (Doc. 38) is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** with respect to Counts One, Twelve, and Twenty and is otherwise **DENIED**.

2.      Summary judgment is **ENTERED in favor of Defendant Latasha McGuire and against Plaintiff Tyrone Bostick** on Counts One and Twelve of the Amended Complaint (Doc. 13).

3.      Summary judgment is **ENTERED in favor of Defendant Latasha McGuire and against Plaintiff Tyrone Bostick** as to Plaintiff's claim under Count Twenty that Defendant Latasha McGuire is liable for failing to intervene to prevent Plaintiff from being pushed to the ground.

4.      This action will proceed to trial on Counts Six, Twelve, Fifteen, and part of Count Twenty as explained in this Order.

**DONE AND ORDERED** in Orlando, Florida, this 7th day of March, 2017.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties