UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TYRONE BOSTICK,

        Plaintiff,

v.                                                                      Case No. 6:15-cv-1533-Orl-37GJK

DEPUTY LATASHA McGUIRE,

        Defendant.

## ORDER

This matter is before the Court on the following matters: (1) Plaintiff's Motion for Judgment Notwithstanding the Verdict or in the Alternative Motion for a New Trial (Doc. 87), filed May 2, 2017; and (2) Defendant's Response in Opposition to Plaintiff's Motion for Judgment Notwithstanding the Verdict or in the Alternative for New Trial (Doc. 88), filed May 16, 2017.

### BACKGROUND

This civil rights action—which concerns Defendant Latasha McGuire's warrantless arrest of Plaintiff Tyrone Bostick after midnight on **August 22, 2011** ("**Arrest**")—was tried before a jury over three days in April 2017. (*See* Docs. 70, 71, 76.) After the Court denied the parties' respective motions for directed verdict (Docs. 72–75), the jury deliberated and reached a verdict in favor of Defendant (Doc. 83 ("**Verdict**")). On April 7, 2017, the Court entered final judgment in accordance with the Verdict. (Doc. 84 ("**Judgment**").) Pursuant to Rules 50(b) and 59 of the Federal Rules of Civil

Procedure, Plaintiff then filed a timely Motion for Judgment Notwithstanding the Verdict ("**JMOL Motion**") or in the Alternative a Motion for a New Trial ("**New Trial Motion**"). (Doc. 87 ("**Motion**").) Defendant filed a response (Doc. 88 ("**Response**")), and the matter is ripe for adjudication.

## LEGAL STANDARDS

Once a "party has been fully heard on an issue during a jury trial," the opposing party may move for judgment as a matter of law ("**JMOL**") on the grounds that "a reasonable jury would not have a legally sufficient evidentiary basis to find" for the non-moving party on the issue. *See* Fed. R. Civ. P. 50(a). If denied, the JMOL motion may be renewed after trial, and the Court then may either: (1) "allow judgment on the verdict"; (2) "order a new trial"; or (3) "direct the entry of [JMOL]." *See* Fed. R. Civ. P. 50(b). The Court has discretion to order a retrial "for any reason for which a new trial has heretofore been granted in an action at law in any federal court." *See* Fed. R. Civ. P. 59(a)(1)(A).

## THE TRIAL

Trial commenced on April 3, 2017.[1] (Doc. 70.) After counsel's opening statements, Plaintiff testified on direct examination about the Arrest. According to Plaintiff, he visited his mother's home on the evening of August 21, 2011. Sometime after 10:30 p.m., he departed her home with plans to walk to his father's home as he "normally" did. After

---

[1] Based in part on the defense of qualified immunity, the Defendant moved for entry of partial summary judgment. (*See* Doc. 38 ("**SJ Motion**").) The Court granted the SJ Motion as to most of Plaintiff's state law claims, but denied the SJ Motion as to his claims under 42 U.S.C. § 1983 for unlawful arrest, unlawful search, and excessive force. (*See* Doc. 50.)

walking for 30 or 45 minutes, Plaintiff reached the intersection of Ivey Lane and Lenox ("**Intersection**"), where Plaintiff first noticed a Dodge Intrepid ("**Unmarked Car**"):

> Well, once I reached the [I]ntersection, I basically had seen this Dodge Intrepid with dark tinted windows roll by me on Ivey Lane. And I was looking at this [C]ar, and something just told me . . . to like keep my eyes on this [C]ar.
>
> And when it got towards the light, it did like a sudden U-turn. And when it did a sudden U-turn, I had just made it to the other side of Lenox from corner to corner. Just going this way.
>
> Now, when I get on this side, this is when I see the same [Car] drive past me and actually make a turn onto Lenox. And when [it] turned onto Lenox, it went like five feet from back of me. And once I seen the back doors open, I decided to jet across the street, straight across the street, at [a] right angle where the light was set. Because at that time I was in fear of my life. I didn't know what to do. I didn't know who these people [were].
>
> \* \* \*
>
> When I started to decide to run across the street, the back doors swung up. I seen . . . a gloved hand, a black gloved hand open the door. And before I could even actually get halfway across to Ivey Lane . . . two males . . . jumped out in all black. And once I got halfway across Ivey, they had already caught up to me. So by the time I got to the corner to get to where the light was, I felt two hands push down on me hard to the point where I fell.

Plaintiff testified that once he was on the ground, the two males ("**Male Officers**"): (1) placed Plaintiff's hands in plastic tie restraints ("**Hand Ties**") behind his back; (2) lifted and dragged him down the street; and (3) repeatedly hit and beat him until a marked police car arrived with activated lights and sirens ("**Marked Car**"). Plaintiff testified that he did not realize that the Male Officers were police officers until the Marked Car arrived because: (1) no one identified themselves as law enforcement officers at any

-3-

time; (2) no one ordered him to stop or gave him a command at any time; (3) other than curses and racial epithets, Plaintiff did not hear the passengers of the Unmarked Car say anything at all to him; and (4) Defendant and the Male Officers were not dressed in uniforms, rather, they were dressed "in all black" clothes.

Plaintiff testified that he was thrown into the Marked Car where he sat in fear for his life and not knowing "who to talk to." At that point, Plaintiff also noticed that he was "bleeding from the scrapes off [his] arms and [his] hands." Fire department personnel ("**EMS**") then arrived and—according to Plaintiff—they attended to the Male Officers "because [Plaintiff's] blood was on them." Plaintiff testified that the EMS then checked him and offered him a Sprite, but they did not treat his injuries.[2] Finally, Plaintiff testified that he was driven to jail in the Marked Car, and—once at the jail—Plaintiff waited while Defendant "wrote her statement up" ("**Arrest Report**"), which charged him with resisting an officer without violence ("**ROWV**"), which is a violation of Florida Statutes, § 843.02 ("**ROWV Statute**").

On cross-examination, Plaintiff testified that: (1) the area where the Arrest occurred—which is where Plaintiff lived his entire life—was "not a high crime area"; (2) the area was dark, but not "completely dark" at the time of his Arrest; (3) Plaintiff could not see who was in the Car because it had tinted windows—including a tinted front

---

[2] A report from the Fire Department ("**FD Report**") was admitted into evidence as Exhibit A6, which indicated that Plaintiff suffered abrasions to his hands and forearm, but his head and back were "normal." Plaintiff testified that the FD Report was "inaccurate" because it did not reflect that his head and back were injured when the Male Officers beat him, and the Fire Department did not care for his injuries as stated in the FD Report.

windshield; and (4) Plaintiff ran because he felt that his life was in danger:

> I felt like my life was in danger to the point where I seen this action, the [black] gloves and the doors open up. And I wasn't going to sit there and just be in the dark [so] something could blindside me. I decided to run across to where a light was. When I was running across to where a light was, they [had] already exited . . . Once they exited the car, they started calling me these cuss words.

Under cross-examination, Plaintiff further testified that he saw Defendant for the first time when the Male Officers replaced the Hand Ties with hand cuffs, and "threw" him in the Marked Car. Plaintiff also reiterated that: (1) the Male Officers were dressed in black clothes that the police would not wear; (2) the Male Officers were wearing gun belts, but they were not wearing badges; (3) Plaintiff did not realize that the Male Officers were police officers when they were in the Unmarked Car or while they chased him, pushed him down, restrained him, and beat him; and (4) Plaintiff was "sure" that nobody yelled for him to stop running and neither Defendant nor the Male Officers were wearing uniforms.

Defendant was the second witness called by Plaintiff. On direct examination, Defendant testified that the night of the Arrest, she and the Male Officers were assigned to "proactive patrol", which involved going into a "high crime area" to "gather intelligence, stop people, [and] see what we can find." Defendant confirmed that the Unmarked Car, which she was driving, bore no markings on the outside that would "notify a person . . . that the [Car] belonged to the Orange County Sheriff's Office." Defendant further testified that when she first observed Plaintiff, he was not doing anything illegal or suspicious: (1) he fit no "be on the lookout" notice; (2) his clothing was

not indicative of having criminal intelligence; (3) he did not appear to have a weapon or burglary tool; and (4) he did not peer into any business that he walked past. Nonetheless, Defendant decided to see if Plaintiff was willing to stop and talk—which she described as a "**Consensual Encounter**."

Defendant testified that she attempted to initiate the Consensual Encounter by pulling the Unmarked Car to a stop approximately five feet behind Plaintiff without saying anything to him.³ According to Defendant:

(1) she and the Male Officers simply exited and "walked to the rear" of the Unmarked Car;

(2) Plaintiff "looked at" her and the Male Officers;

(3) once Plaintiff saw Defendant and the Male Officers, "he began running" toward Ivey Lane on the passenger side of the Unmarked Car where he passed Defendant and Male Officers;

(4) while she and the Male Officers chased Plaintiff, she "articulated 'Stop we are the police'" ("**Command**");

(5) after the Command, Plaintiff continued to run;

(6) Plaintiff stopped running when he tripped on a drainage ditch ("**Ditch**") and fell to the ground;

(7) once Plaintiff was on the ground, the Male Officers grabbed him and held him—but did not beat him—while Defendant put the Hand Ties on Plaintiff;

(8) she searched Plaintiff, but she found no contraband;

---

³Plaintiff and Defendant both estimated that the Unmarked Car was approximately five feet from Plaintiff. The Male Officers estimated that Plaintiff was seven to ten yards from the Unmarked Car.

> (9) upon seeing Plaintiff's scrapes, she summoned the Fire Department; and
>
> (10) ultimately, she went to the jail with Plaintiff, authored the Arrest Report, and charged Plaintiff with ROWV.

Defendant testified that the "factual" ground for the ROWV charge was that she "ordered him to stop, [she] identified as law enforcement, [and] he continued to run thereby disobeying my lawful [C]ommand to stop." Further, Defendant testified that she had "two reasons" to issue the Command: (1) first, Plaintiff "took off at the sight of law enforcement in a high-crime area"; and (2) second, when Plaintiff "started running across the roadway from one side of Lenox to the other across Ivey Lane . . . he actually ran at a diagonal instead of a 90 degree angle to the sidewalk," which is a "violation" of Florida's jaywalking statute, Florida Statutes, § 316.130(12) ("**JW Statute**").

On cross-examination, Defendant testified that the night of the Arrest, she was wearing a "duty uniform" ("**Uniform**") as depicted in a photograph ("**Uniform Photo**"), which was admitted into evidence without objection.[4] The Uniform consisted of long pants and a short-sleeved collared shirt with patches on both sleeves that said "Orange County Sheriff." The Uniform also included a badge on the left breast and a "utility belt" that held a taser, gun, magazine pouches, a handcuff case, and a radio. Defendant denied that the windshield of the Car was tinted, and she testified that there was "not a single vehicle in our fleet that has a tinted windshield." Defendant also denied that she saw

---

[4] On redirect examination, Defendant admitted that the Uniform Photo was taken in well-lit conditions that differed from those that existed on the night of the Arrest.

Plaintiff struck, beat, or dragged by any law enforcement officer. Finally, Defendant reasserted that Lenox and Ivey was a "high crime area" and it was well-lit the night of the Arrest.

On the second day of trial, Plaintiff called the Male Officers to testify—Ryan Donovan ("**Officer Donovan**") and Brian Hummel ("**Officer Hummel**"). Both Officers testified on direct examination that Plaintiff took "head long flight" *after*: (1) Defendant stopped the Unmarked Car; (2) Defendant and the Male Officers exited the Unmarked Car; and (3) Plaintiff looked at them and could identify them as law enforcement officers.

Officer Donovan also testified that: (1) he observed Plaintiff violate the JW Statute; (2) he did not say anything to Plaintiff upon exiting the Unmarked Car or while chasing Plaintiff; (3) he did not believe that any of the officers said anything to Plaintiff upon exiting the Car; (4) "after the fact," Defendant informed him and Deputy Hummel that she made the Command; and (5) he did not "recall" hearing the Command.[5] Officer Hummel similarly testified that: (1) he did not give Plaintiff any order "at any point"; (2) he did not recall hearing any other Officer issue any command to Plaintiff upon exiting the Unmarked Car or during the chase; and (3) he did not recall hearing Defendant issue the Command. Finally, both Officers testified that: (1) they were wearing Uniforms similar to the one depicted in the Uniform Photo; (2) the windshield on the Unmarked Car was not tinted; and (3) they did not push, shove, or beat Plaintiff.

---

[5] On redirect examination, Officer Donovan testified that he could not "speculate" concerning what Plaintiff heard or didn't hear, but Officer Donovan "went on" Defendant's word that she yelled the Command.

Plaintiff rested his case after Officer Hummel testified, and Defendant then advised that it would present no testimonial evidence. Both parties then moved for directed verdicts in their favor (Docs. 72, 74), and the Court denied both motions (Docs. 73, 75). In rejecting Plaintiff's argument that the record plainly established that Plaintiff's flight was provoked by Defendant, the Court noted the conflicting testimony and concluded that it was for the "jury to determine whether or not [Plaintiff's] flight under the circumstances was provoked or unprovoked."[6]

After denying the parties' directed verdict motions, the Court: (1) provided the parties with copies of the Court's proposed jury instructions (Doc. 80) and an explanatory index (Doc. 81 ("**Index**")); and (2) conducted a jury charge conference ("**Conference**").[7] During the Conference, Plaintiff objected to instructing the jury that Florida law authorizes law enforcement officers to conduct warrantless arrests of persons who violate the JW Statute ("**JW Objection**"). The Court overruled the JW Objection.

On the third day of trial (Doc. 76), the Court instructed the jury on the law (*see* Doc. 82), the parties made their closing arguments, and the jury deliberated and reached their Verdict (Doc. 83). After the Court entered Judgment (Doc. 84), Plaintiff filed his Motion (Doc. 87), and Defendant filed her Response (Doc. 88). Upon consideration, the

---

[6] In denying Defendant's motion, the Court noted that "there is certainly evidence from which the jury could reasonably determine there was no [C]ommand given."

[7] Prior to trial, the parties were required to jointly submit a set of proposed jury instructions, which may include "contested instructions" in accordance with the Court's Case Management and Scheduling Order (Doc. 21 ("**CMSO**")). (Doc. 61, pp. 1–2.) The CMSO instructs parties to designate the contested charge as such "with the name of the requesting party and bearing at the bottom a citation of authority for its inclusion, together with a summary of the opposing party's objection." (Doc. 21, p. 10.)

Court finds that the Motion is due to be denied.

## DISCUSSION

**A.     JMOL Motion**

Plaintiff argues that he is entitled to relief under Rule 50(b) because: (1) "as a matter of law, the Defendant's actions provoked [Plaintiff's] flight, and it was unreasonable to arrest [Plaintiff] for 'jaywalking' or for [ROWV]" (Doc. 87, p. 5); and (2) "there was no evidence presented that [Plaintiff] heard [the Command], only that it may have been given by [Defendant]" (*id.* at 6).

In resolving a JMOL motion, the Court must be "squarely and narrowly focused on the sufficiency of the evidence." *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007). Although the Court may not defer to the jury's findings, *see id.*, it must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor, *see U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 993 (11th Cir. 1993). The Court will grant a JMOL motion "only if the evidence is so overwhelmingly in favor" of the moving party that a reasonable jury could not have resolved the matter in favor of the non-moving party. *See Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). The Court will deny the motion if the jury verdict is supported by "enough evidence that reasonable minds could differ concerning the material facts." *See U.S. Anchor Mfg.*, 7 F.3d at 993.

Here, the jury's Verdict is supported by sufficient evidence upon which reasonable minds could find in favor of Defendant. Although Plaintiff's testimony supported his contention that Defendant provoked his flight, it is evident that the jury rejected this

narrative. The jury's rejection was reasonable given the testimony of the Defendant and the Male Officers that Plaintiff did not flee until he had sufficient opportunity to view them in their full law enforcement uniforms. Although the evidence that Defendant issued the Command and that Plaintiff continued to run after hearing such Command is far less weighty (*see supra* note 6), it is nonetheless sufficient to defeat the JMOL Motion.

**B.     New Trial Motion**

Plaintiff alternatively argues that he is entitled to a new trial because the Verdict was against the great weight of the evidence and the Court instructed the jury with a misstatement of Florida law that "misled the jury into believing [that Plaintiff] could be arrested for jaywalking." (Doc. 87, pp. 8–9 (contending that the Court should have sustained his Jaywalking Objection because, "based on the 'plain language' of Fla. Stat. §§ 318.14, 316.130(19), and 316.665," jaywalking is "a non-arrestable offense").)

Courts may order a retrial if, after reweighing all of the evidence, it "believes that the verdict rendered by the jury was contrary to the great weight of the evidence." *See Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982). After reweighing the evidence here, the Court finds that the evidence concerning whether the Command was given and heard by Defendant was static, and the great weight of the remaining evidence supported the Verdict. Accordingly, the Court is not persuaded that a new trial is warranted based on the record evidence. *See id.* (reversing the trial court's grant of new trial in § 1983 action because there was "no great weight of evidence in any direction").

Courts also may grant a new trial to prevent the miscarriage of justice that would result from a jury verdict that is based on improper jury instructions. *See Costa v. Sam's*

*East, Inc.*, 524 F. App'x 548, 550 (11th Cir. 2013) (affirming trial court's denial of new trial motion). Jury instructions must be examined in context and "as a whole to determine whether they fairly and adequately addressed the issue and correctly stated the law." *Christopher v. Cutter Labs.*, 53 F.3d 184, 90–91 (11th Cir. 1995).

As explained in the Index, the Court overruled the JW Objection based on clear and controlling law. (*See* Doc. 81, p. 4 (referencing Florida Statutes, § 901.15 and *Durruthy v. Pastor*, 351 F.3d 1080 (11th Cir. 2003).) Plaintiff has not persuaded the Court that this decision was erroneous, and he has not established that he suffered prejudice as a result of the ruling. Thus, the New Trial Motion is due to be denied.

### CONCLUSION

It is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Judgment Notwithstanding the Verdict or in the Alternative Motion for a New Trial (Doc. 87) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida, this 14th day of July, 2017.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record